**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**TRIBUNAL DE PRIMERA INSTANCIA**
**SALA SUPERIOR DE SAN JUAN**

| | |
|---|---|
| **ESTADO LIBRE ASOCIADO DE PUERTO RICO en representación de ADMINISTRACIÓN DE SERVICIOS GENERALES; DEPARTAMENTO DE SEGURIDAD PÚBLICA,**<br><br>Demandante<br><br>v.<br><br>**TEXAS ARMORING CORPORATION; RONALD TRENT KIMBALL, como Principal Oficial Ejecutivo de Texas Armoring Corporation,**<br><br>Demandados. | **CASO NÚM.**<br><br>**SALA:**<br><br>**SOBRE:** Sentencia Declaratoria; nulidad contractual; cobro de lo indebido; incumplimiento de contrato |

## DEMANDA

**AL ILUSTRADO TRIBUNAL:**

COMPARECE el **Estado Libre Asociado de Puerto Rico**, en representación de la Administración de Servicios Generales y el Departamento de Seguridad Pública, quien por conducto de la representación legal que suscribe, muy respetuosamente **EXPONE**, **ALEGA** y **SOLICITA**:

### I. JURISDICCIÓN Y COMPETENCIA

El Tribunal de Primera Instancia, Sala Superior de San Juan, es el foro con jurisdicción y competencia para atender el caso de epígrafe en virtud de las disposiciones de la Ley de la Judicatura de Puerto Rico, Ley Núm. 201-2003, y las Reglas 3.1(a)(2) y 3.5 de Procedimiento Civil, 32 L.P.R.A. Ap. V, Rs. 3.1(a)(2) y 3.5, toda vez que se trata de una acción en contra de una corporación foránea organizada bajo las leyes del estado federado de Texas que tuvo contacto con Puerto Rico al obligarse en una transacción con el Gobierno de Puerto Rico.

### II. PARTES

1.      La parte demandante es el Estado Libre Asociado de Puerto Rico quien comparece representado por el Departamento de Justicia. El Departamento de Justicia fue

creado conforme lo dispuesto en la Sección 6 del Articulo IV de la Constitución del Estado Libre Asociado. En virtud de la Ley Orgánica del Departamento de Justicia, Ley Núm. 205-2004, dicha entidad representa a las agencias y funcionarios en procesos civiles instados en los tribunales u otros foros en o fuera de Puerto Rico. Las oficinas principales del Departamento de Justicia se encuentran ubicadas en: Calle César González, esquina Ave. Jesús T. Piñeiro, San Juan, Puerto Rico, con dirección postal: P.O. Box 9020192, San Juan, PR 00902-0192.

2.      La Administración de Servicios Generales ("ASG"), es una agencia administrativa creada en virtud de la Ley de la Administración de Servicios Generales para la Centralización de las Compras del Gobierno de Puerto Rico de 2019, Ley. Núm. 73-2019. La ASG es la entidad responsable de establecer la política pública relacionada con las compras de bienes, obras y servicios no profesionales para todas las Entidades Gubernamentales y Entidades Exentas. Véase, Ley Núm. 73-2019, Art. 5.

3.      El Departamento de Seguridad Pública ("DSP") fue creado mediante la Ley del Departamento de Seguridad Pública, Ley Núm. 20-2017, a los fines de crear un nuevo sistema integrado por todos los componentes que administran la seguridad pública en Puerto Rico. El Departamento tiene el objetivo de promover un sistema de seguridad más efectivo, eficiente, funcional y que trabaja de forma integrada entre sus componentes y con otras agencias del Gobierno de Puerto Rico.

4.      La parte demandada, Texas Armoring Co. ("TAC") es una empresa privada que ensambla vehículos de motor blindados en los Estados Unidos. Según la información o creencia, TAC es una corporación creada al amparo de las leyes del estado federado de Texas, con oficinas físicas ubicadas en 4323 Factory Hill St., San Antonio, TX 78219-2702. Su agente residente y presidente es el Sr. Ronald Trent Kimball, cuyo número de registro de contribuyente en dicho estado es 0143797400.

5.      El señor Ronald Trent Kimball es el Principal Oficial Ejecutivo ("CEO" por sus siglas en inglés) de TAC y su dirección es, según la información o creencia, 4323 Factory Hill St., San Antonio, TX 78219-2702.

### III. RELACIÓN DE HECHOS

6.      En el 2018, la Fortaleza tomó la decisión de adquirir, mediante un contrato de compra, un vehículo de motor blindado marca Chevrolet Suburban de 2018 para suplir la necesidad de un vehículo que transportara al otrora gobernador.

7.      Luego de evaluar diversas cotizaciones, los funcionarios que se encontraban en dicho proceso de selección decidieron adquirir el vehículo de motor blindado a TAC.

8.      Conforme al contrato de compra que consta en el expediente de ASG, el precio de venta pactado entre las partes fue $245,000.

9.      Así las cosas, el 26 de febrero de 2018, el Sr. Raymond Cruz, otrora Director de la Oficina del exgobernador Rosselló Nevares, y el Sr. Ronald Trent Kimball, Presidente de TAC, subscribieron un contrato para la adquisición del vehículo de motor blindado. Véase, **Anejo I**. En lo pertinente, el contrato suscrito entre las partes detallaba lo siguiente:

   i.   El vehículo de motor blindado que se adquiriría era una Chevrolet Suburban de 2018, a un costo total de $272,550.

   ii.   Se conferiría un descuento de $27,550.

   iii.   El precio final del vehículo de motor blindado era **$245,000**.

   iv.   Se requería el 100% del costo del "chasis blindado" como depósito.

   v.   Se requería el 50% del ensamblaje de blindaje como deposito inicial.

   vi.   Se requería el 50% del balance restante antes de que TAC realizara la entrega del vehículo de motor blindado.

   vii.   La entrega del bien debía ocurrir entre **120-150** días, luego de recibido el depósito inicial o, en la alternativa, una vez que se notificara que el proyecto fue culminado.

   viii.   El balance restante tendría que ser pagado en su totalidad una vez TAC notificara que el proyecto fue culminado.

   ix.   Una vez culminado el ensamblaje del vehículo de motor blindado, éste podía ser inspeccionado en las facilidades de TAC previo a su entrega.

   x.    El contrato contiene una cláusula de selección de foro e interpretación del contrato bajo las leyes de Texas.

10. El 26 de febrero de 2018, la ASG emitió el comprobante de pago contra obligación por la cantidad de $165,950.

11. El 1 de marzo de 2018, el Departamento de Hacienda emitió un cheque a nombre de TAC por la cantidad de $165,950. Este primer pago constituyó el depósito inicial, según el presunto contrato de compra. Sin embargo, TAC no prestó la fianza requerida por las disposiciones legales aplicables en Puerto Rico cuando se realiza una transacción que conlleva un pago anticipado en exceso de $10,000. Más aún, el Departamento de Hacienda no concedió una dispensa para obviar el requisito de pago de fianza o autorizar el pago por anticipado en exceso de $10,000, como el que recibió TAC.

12. De conformidad al presunto contrato, el vehículo de motor blindado debía ser entregado en junio de 2018 y, como tarde, en julio de 2018. Véase, **Anejo I**, Texas Armoring Corporation Sales Contract/Purchase Agreeement.

13. El 23 de octubre de 2018, el Sr. Luis A. Martínez, Administrador de la Oficina de la Fortaleza, le dirigió una misiva al Sr. Henry Escalera, entonces Comisionado del Negociado de la Policía ("Negociado"). En dicha carta, la Fortaleza le indicó al Negociado que, desde julio de 2018, el Gobernador ordenó la transferencia del vehículo blindado a dicha dependencia. Más aún, se le indicó al Negociado que sería el dueño de la unidad por lo que debía pagar el balance restante y finalizar la transacción con TAC.

14. La Fortaleza le indicó al Negociado que el balance restante para adquirir el vehículo de motor blindado era de $58,150 a ser pagados en o antes del 26 de octubre de 2018, si deseaban acogerse al descuento ofrecido por TAC.[1]

15. Así las cosas, el 25 de octubre de 2018, se emitió el comprobante de pago a nombre de TAC por la cantidad de $58,150. Según su descripción, el pago era por el balance restante según la orden de compra 1840440053.

16. Desde el 26 de octubre de 2018 hasta principios del mes de febrero de 2019, TAC no informó ni se comunicó con los demandantes sobre algún aspecto relacionado a la compra del vehículo de motor blindado. Y es que, no es hasta el 5 de febrero de 2019 que el Sr. Mike Weaver de TAC remitió un correo electrónico al Sr. Mike Avilés y al Sr. Jesús

---

[1] El presunto contrato no contiene condición alguna que aluda a dicho descuento, por lo que si el descuento retiene su validez o no, será materia de descubrimiento del presente litigio.

Hernández del DSP. En dicho correo electrónico, el Sr. Weaver manifestó—en síntesis—que el vehículo sería entregado a finales de abril de 2019. Además, el Sr. Weaver justificó la demora en la entrega del vehículo a alegados problemas con sus suplidores, así como a un supuesto cambio que se realizó, el 18 de octubre de 2018, a las especificaciones de la unidad.

17. No obstante, ASG no identificó enmienda al presunto contrato o algún otro documento válido que acredite que se realizaron las órdenes de cambio alegadas por el Sr. Weaver. El correo electrónico remitido por el Sr. Weaver incluyó varias fotos en donde se ilustra el supuesto ensamblaje de seguridad que se había instalado hasta esa fecha en el vehículo de motor blindado.

18. El 20 de mayo de 2019, el Sr. Héctor Ortiz Méndez del Negociado le cursó un correo electrónico al Sr. Weaver para indicarle que había estado en contacto con el personal de TAC con el propósito de obtener información sobre el proceso de adquisición de la unidad blindada. En dicho correo electrónico, el Sr. Ortiz Méndez le indicó a TAC que en varias ocasiones le había solicitado a dicha empresa que le proveyeran información sobre la unidad; a saber, el estatus del vehículo y la fecha estimada para su entrega en Puerto Rico.

19. El 21 de mayo de 2019, el Sr. Ortiz Méndez le cursó un segundo (2) correo electrónico al Sr. Weaver con el propósito de brindar seguimiento a la solicitud de información con relación al estatus de la Chevrolet Suburban de 2018.

20. El 22 de mayo del 2019, el Sr. Ortiz Méndez le cursó un tercer (3) correo electrónico al Sr. Weaver en donde le indicó que continuaba en espera de la información relacionada al vehículo de motor blindado y que necesitaba que se le proveyera la información de manera urgente.

21. El 23 de mayo de 2019, el Sr. Ortiz Méndez le cursó un cuarto (4) correo electrónico al Sr. Weaver en donde le indicó que le había cursado varias comunicaciones para obtener respuesta sobre el estatus del vehículo de motor blindado y que era altamente preocupante que la compañía no hubiese contestado dichas comunicaciones.

22. Luego de los intentos antes desglosados realizados por el Sr. Ortiz Méndez para obtener respuesta sobre el estatus del vehículo de motor blindado, en horas de la tarde

del 23 de mayo de 2019, el Sr. Weaver le contestó al funcionario que no estaba autorizado a proveerle ninguna información sin el consentimiento del contacto autorizado en Puerto Rico.

23.     El 3 de septiembre de 2019, el Sr. Pérez Estrella, funcionario del DSP, le envió un correo electrónico al Sr. Weaver en donde le indicó que el Sr. Ortiz Méndez sería el nuevo punto de contacto para culminar el proceso de adquisición del vehículo de motor blindado.

24.     El 10 de septiembre de 2019, el Sr. Ortiz Méndez le envió un correo electrónico al Sr. Weaver en donde por quinta (5) ocasión le solicitó información sobre el paradero del vehículo blindado cuya adquisición fue pactada y pagada.

25.     El 9 de octubre de 2019, el Sr. Pérez Estrella le envió un correo electrónico a Sr. Trent Kimball, presidente de TAC, para volver a solicitar información del vehículo de motor blindado, el estatus de ésta, y una fecha estimada para su entrega.

26.     El 11 de octubre de 2019, Sr. Kimball le envió un correo electrónico al Sr. Pérez Estrella en donde le indicó que remitiría su correo electrónico del 9 de octubre de 2019 al Gerente de Producción y al Gerente de Servicio al Cliente de TAC para su correspondiente seguimiento. Ello, toda vez que eran el Gerente de Producción y el Gerente de Servicio al Cliente de TAC quienes estaban más familiarizados con los trámites relacionados al vehículo de motor blindado. Además, el Sr. Kimball de TAC añadió—en su correo electrónico del 11 de octubre de 2019—que la unidad blindada **había sido objeto de varios cambios de especificaciones** y que la misma había estado en las facilidades de TAC por espacio de dos (2) años. Nuevamente, TAC indicó que la unidad blindada había sido objeto de varios cambios en las especificaciones, pero no proveyó documento alguno en donde se pactaran dichos cambios ni informó quién ordenó los mismos.

27.     Al no haberse obtenido respuesta alguna por parte de TAC, el 17 de octubre de 2019, el Sr. Pérez Estrella le remitió otro correo electrónico al Sr. Kimball, al Sr. Weaver y a varios otros empleados de TAC, en donde les solicitó la información de algún contacto en dicha empresa que le pudiera brindar la información sobre el estatus del vehículo de motor blindado.

28.     Luego de varias comunicaciones entre TAC y el DSP, el 5 de noviembre de 2019, se sostuvo una conferencia telefónica entre ambas entidades.

29.     Es importante destacar que luego de sostenida la conferencia telefónica del 5 de noviembre de 2019, el Sr. Weaver de TAC remitió un correo electrónico a la Sra. Silvia B. Saldaña, Chief of Staff del DSP, en donde incluyó fotos de un vehículo Cadillac Escalade que, según los oficiales de TAC, era similar a la Chevrolet Suburban que se había comprado por parte del Gobierno de Puerto Rico. Lo anterior demuestra que TAC le ofreció un vehículo de motor distinto al DSP para sustituir la Chevrolet Suburban que había sido pagada por adelantado.

30.     El 26 de mayo de 2020, la Sra. Melinda Romero, funcionaria del DSP, le envió un correo electrónico al Sr. Kimball y a otros componentes de TAC para conocer sobre el estatus del vehículo, así como información pertinente para finalizar la transferencia del vehículo blindado.

31.     El 5 de junio de 2020, el Sr. Weaver le contestó el correo electrónico en donde la Sra. Romero indicó que no existía comunicación alguna que reflejara un balance pendiente. Consecuentemente, la Sra. Romero le solicitó al Sr. Weaver copia de la factura que reflejara algún balance pendiente.

32.     No obstante, el Sr. Weaver se limitó a reenviar un correo electrónico con fecha del 18 de octubre de 2018 en donde indicó que el Sr. Jesús Hernández del DSP presuntamente había ordenado un cambio en las especificaciones del vehículo de motor blindado. En dicho correo electrónico del 18 de octubre de 2018, el Sr. Weaver expresó que existía un balance pendiente de $58,150 que tenía que ser pagado en o antes del 24 de octubre de 2018. Además, en dicho correo se indicó que, si se recibía el pago en o antes del 24 de octubre de 2018 la unidad blindada estaría terminada entre noviembre y diciembre de 2018 o, en la alternativa, no más tarde de febrero de 2019.

33.     Adicional a la comunicación aludida en el párrafo 26 de la presente Demanda, no se ha encontrado algún documento válido firmado por autoridad competente que haya autorizado un cambio en las especificaciones del vehículo de motor blindado o que haya autorizado enmendar el contrato de compra de dicho bien.

34.     La Sra. Romero del DSP le indicó al Sr. Weaver, mediante correo electrónico, que el cheque por el balance adeudado de $58,150 había sido emitido por el Negociado desde el 26 de octubre de 2018. Por tanto, la Sra. Romero le solicitó al Sr. Weaver que le remitiera algún documento que evidenciara el supuesto cambio en las especificaciones de la unidad que justificara algún balance pendiente. Más aún, la Sra. Romero cuestionó al Sr. Weaver si el vehículo de motor blindado se encontraba en las instalaciones de TAC.

35.     El Sr. Weaver le contestó a la Sra. Romero que el vehículo se encontraba seguro en las facilidades de TAC en San Antonio, Texas. Además, el Sr. Weaver le comunicó a la Sra. Romero que sólo se había culminado la cabina central del vehículo y que la producción se detuvo hasta que se recibiera la decisión final del DSP, pues éste informó que se habían solicitado múltiples cambios en las especificaciones, pero no especificó cuáles.

36.     En un correo electrónico del 4 de junio de 2020, TAC informó—por primera vez—que el balance adeudado por el vehículo blindado era de $20,875.

37.     El 3 de diciembre de 2020, la ASG le solicitó al DSP toda la documentación pertinente para conocer sobre el paradero del vehículo, así como para entender cuáles eran los trámites que faltaba realizar para completar el proceso de entrega del vehículo de motor blindado.

38.     El 3 de diciembre de 2020, el Sr. Joel Fontánez, Subadministrador de la ASG, le envió un correo electrónico al Sr. Weaver de TAC para buscar una rápida solución al trámite para la adquisición y entrega del vehículo de motor blindado. Además, el Sr. Fontánez le indicó al Sr. Weaver que, debido a las controversias surgidas en el proceso de adquisición del vehículo y en atención a los mejores intereses de las partes, era necesario llegar a un entendido que permitiese transportar el vehículo de motor blindado a Puerto Rico.

39.     El 3 de diciembre de 2020, el Sr. Weaver le escribió al Sr. Joel Fontánez que sus superiores evaluaban la situación por lo que se comunicaría con él posteriormente.

40.     El 4 de diciembre del 2020, el Sr. Carlos Freires, funcionario de la ASG, le envió un correo electrónico al Sr. Weaver para conocer si algún empleado de TAC estaba

8

disponible para proveer información sobre el vehículo de motor blindado.

41. El 7 de diciembre de 2020, la Sra. Romero del DSP le indicó al Sr. Weaver que, en adelante, la ASG se haría cargo de culminar el proceso para la adquisición y entrega del vehículo de motor blindado.

42. El 7 de diciembre de 2020, el Sr. Weaver—mediante un correo electrónico—informó que discutiría con su equipo de trabajo las especificaciones y el tiempo estimado para culminar la producción del vehículo de motor blindado. El Sr. Weaver de TAC revisaría el contrato ya que entendía que existía un balance pendiente de pago.

43. El 11 de diciembre de 2020, el Sr. Weaver—mediante otro correo electrónico—expresó que todavía su equipo se encontraba discutiendo los detalles del proyecto y descifrando cuál era el tiempo estimado para culminarlo. Según informó el Sr. Weaver, para finales de esa semana compartiría toda la información necesaria en vías de establecer el próximo paso a seguir para la culminación del ensamblaje del vehículo de motor blindado.

44. El 18 de diciembre de 2020, la licenciada Mercado Rivera remitió otro correo electrónico al Sr. Weaver, en el cual le solicitó que, antes del 31 de diciembre de 2020, le proveyera la siguiente información:

    a. Si el vehículo de motor blindado había sido terminado de ensamblar.

    b. Si existía algún balance pendiente.

    c. Si existía algún balance pendiente, que se explicaran las razones para dicho balance.

45. El 18 de diciembre de 2020, el Sr. Weaver le contestó a la licenciada Mercado que no podía proveerle información alguna sobre el vehículo de motor blindado hasta que regresara a sus oficinas luego de fin de año. Además, el Sr. Weaver se disculpó por la demora y atribuyó la misma a la pandemia por COVID-19, a pesar de que el vehículo de motor blindado había sido ordenado desde el 2018.

46. El 5 de enero de 2021, el Sr. Weaver le remitió un correo electrónico a la licenciada Mercado Rivera para indicarle que estaba recopilando la información solicitada y que estaría remitiendo la misma a la mayor brevedad posible.

47. El 22 de enero de 2021, el Sr. Fontánez, Subadministrador de la ASG, le remitió una carta al Sr. Weaver en donde le expresó que lo único que se le había requerido era lo siguiente:

a. El historial completo de la compra.

b. Si el vehículo estaba listo para su entrega.

c. Si existía un balance pendiente.

d. De existir algún balance, las razones para dicho balance.

e. Los esfuerzos de TAC para completar la transacción.

f. Las razones por la cual no se había culminado la entrega del vehículo.

g. Cuál era el próximo paso para que el vehículo estuviese en Puerto Rico.

48. El 22 de enero de 2021, el Sr. Fontánez le indicó al Sr. Weaver de TAC que de no recibir la información requerida estaría refiriendo el expediente de este contrato al Departamento de Justicia para que se iniciara la investigación correspondiente.

49. El 27 de enero de 2021, ni el Sr. Fontánez ni algún otro funcionario de la ASG recibió la información que fue solicitada en más de una ocasión a los oficiales de TAC. Por tal razón, se presenta el caso de epígrafe en la que se solicita que se emita una sentencia declaratoria, se declare la nulidad del acuerdo de venta, se decrete el incumplimiento de contrato y se determine que hubo un cobro de lo indebido por parte de TAC.

50. Al momento de presentar el caso de epígrafe, se han desembolsado un total de $224,100 de fondos públicos pertenecientes al Pueblo de Puerto Rico, para la compra de un vehículo de motor blindado, **pero hasta la fecha el mismo no ha sido entregado ni se conoce si TAC si quiera comenzó el ensamblaje del mismo**.

51. Todas las agencias involucradas en el proceso de adquisición del vehículo de motor han realizado múltiples intentos de contactar a TAC para conocer el estatus de la guagua blindada. Sin embargo, los intentos para obtener la información por parte de TAC han sido infructuosos y dicha empresa se ha negado a proveer información al respecto.

52. Conforme a lo anterior, la parte demandante desconoce si la unidad siquiera existe, si el ensamblaje fue culminado o si la misma se encuentra en las instalaciones de TAC.

53.     El DSP, la ASG y todas las agencias concernientes han confrontado problemas en saber el estatus actual de la compra del vehículo de motor que es el objeto del contrato de compra suscrito entre las partes.

54.     Al momento, la propiedad para cuya adquisición se desembolsaron fondos públicos no ha sido entregada a la Fortaleza ni a la ASG ni al DSP.

55.     Tanto la ASG como el DSP han confrontado múltiples obstáculos para lograr la comunicación adecuada con TAC e indagar sobre la entrega del vehículo.

56.     Ante la cantidad de fondos públicos que fueron desembolsado por el Gobierno de Puerto Rico y la inexistencia de la entrega de la propiedad adquirida, es imperativo que este Ilustrado Tribunal examine el presunto contrato de compra y determine que el mismo es nulo por incumplir con las salvaguardas legales necesarias para proteger los fondos públicos pertenecientes al Pueblo de Puerto Rico. Es decir, el presunto contrato de venta es nulo toda vez que va en contra del interés público al no realizarse conforme a las disposiciones legales aplicables a la contratación gubernamental en Puerto Rico.

## IV. EXPOSICIÓN DEL DERECHO APLICABLE

### A. La Sentencia Declaratoria

57.     La sentencia declaratoria se ha definido como un mecanismo "remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales", siempre que se demuestre la existencia de un peligro real contra la parte que solicita la sentencia declaratoria. Sánchez et al v. Srio. de Justicia et al., 157 DPR 360, 383–384 (2002); Charana v. Pueblo, 109 DPR 641, 653 (1993). Asimismo, el Tribunal Supremo de Puerto Rico ("TSPR" o "Tribunal Supremo") ha reconocido que la sentencia declaratoria es un mecanismo idóneo para adjudicar controversias de índole constitucional. Asociación de Periodistas v. González, 127 DPR 704, 723–724 (1991).

58.     La Regla 59.1 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 59.1, establece lo relativo a las sentencias declaratorias. La sentencia declaratoria tiene el propósito de permitir que se anticipe la materialización de futuras causas de acción, y ofrece un procedimiento judicial práctico para resolver una controversia antes de que ésta llegue a la

etapa en que sea necesario otro remedio directo. <u>Moscoso v. Rivera</u>, 76 DPR 481, 489 (1954).

59.     Asimismo, la Regla 59.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 59. 2, dispone que toda persona cuyos derechos, estado u otras relaciones jurídicas fuesen afectados por un estatuto, ordenanza municipal, **contrato** o franquicia, podrá solicitar una decisión sobre cualquier divergencia en la interpretación o validez de dichos estatutos, ordenanzas, contrato o franquicia, y además que se dicte una declaración de los derechos, estados u otras relaciones jurídicas que de aquellos de deriven. En ese sentido, la Regla 59.2 (a) y (b) de Procedimiento Civil prevé dos supuestos en los que un tribunal puede emitir una sentencia declaratoria.

60.     En el presente caso, las partes contratantes (el Estado y TAC) suscribieron un contrato de compra para la adquisición de un vehículo de motor blindado. Sin embargo, el contrato suscrito por las partes contiene una serie de cláusulas que tienen que ser interpretadas por este Tribunal y declaradas nulas por violentar el interés público. Este Ilustrado Tribunal puede declarar nulas las cláusulas de selección de foro y de selección de ley aplicable a la interpretación del contrato de compra. Ello, pues el aludido contrato es uno gubernamental que implica el desembolso de fondos públicos. <u>De Jesús González v. A.C.</u>, 148 DPR 255, 268 (1999) (estableciendo que la sana y recta administración de los fondos del Pueblo está revestida del más alto interés público). Así pues, por los fundamentos que se esbozan a continuación, este Ilustrado Foro puede declarar las referidas cláusulas nulas mediante una sentencia declaratoria.

**B.  Cláusula de selección de foro e interpretación del contrato**

61.     De ordinario, en Puerto Rico se reconoce la validez de las cláusulas de selección de foro. El propósito de incluir esta disposición contractual es establecer cuál será el foro donde se atenderán las disputas que puedan surgir de la relación contractual entre las partes. <u>Bobé v UBS Financial Services</u>, 198 DPR 6 (2017).

62.     Como regla general, cuando las partes incluyen una cláusula de selección de foro en un contrato, ésta debe ser respetada, pues obedece a la libre voluntad de los contratantes. De acuerdo con la doctrina, la validez y aplicabilidad de una cláusula de selección de foro, es un asunto de umbral que se debe atender antes de examinar la validez

de un contrato en general. <u>Bobé</u>, 198 DPR 6. Por lo tanto, las cláusulas contractuales de selección de foro en Puerto Rico **son prima facie válidas y la parte que se oponga a su aplicación carga con el peso de la prueba**. <u>Unisys v. Ramallo Brothers</u>, 128 DPR 842 (1991).

63.    En Puerto Rico se han ido desarrollando jurisprudencialmente ciertos criterios para guiar el análisis de los tribunales sobre las circunstancias que deben mediar cuando un tribunal debe determinar la no aplicabilidad de la cláusula contractual de selección de foro. Entre estos se encuentran:

     a. Que el foro seleccionado resulte ser irrazonable e injusto.

     b. Que de ventilarse el caso en dicho foro se incurriría en una clara y patente inequidad, o sería irrazonable o injusto.

     c. Que la cláusula no es válida porque fue negociada mediando fraude o engaño.

     d. Que la implantación de dicha cláusula derrotaría la política pública del Estado.

64.    De conformidad al contrato suscrito, las partes pactaron una cláusula de selección de foro siendo establecido que cualquier controversia relacionada al contrato se ventilaría ante el tribunal estatal y el tribunal federal del condado de Bexar, Texas. Además, el contrato también establece que el mismo se interpretará de acuerdo con las leyes de Texas.

65.    Es nuestra postura que la cláusula de selección de foro y de interpretación del contrato es nula ya que claramente la implantación de la misma derrotaría la política pública del Estado con respecto a la protección y desembolso de los fondos públicos. La Constitución del Estado Libre Asociado de Puerto Rico, en su Artículo IV, Sección nueve (9) dispone, expresamente, lo siguiente:

> **Sólo se dispondrá de** las propiedades y **fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado,** y <u>**en todo caso**</u> **por autoridad de ley**. (Énfasis y subrayado nuestro).

66.    Dicho mandato constitucional establece, expresamente y sin lugar a duda, que solo se dispondrán y utilizarán fondos públicos, en los casos autorizados por ley, **sin excepción**:

> **Nuestro Gobierno, por tanto, tiene la responsabilidad de velar por el uso y manejo apropiado de los fondos públicos**. El referido mandato constitucional le impone al Estado el deber de velar porque la utilización de los dineros del pueblo esté siempre ligado al bienestar general de todos los ciudadanos. Como parte de los esfuerzos para

cumplir con esta encomienda se ha establecido, a través de los años, una clara política pública contra la corrupción gubernamental y **exaltando la sana administración pública**.

 Marina Costa Azul v. Comisión de Seguridad y Protección de la Policía, 170 DPR 847 (2007), en la pág. 6.

67.    En cumplimiento con el referido mandato constitucional contenido en el Artículo VI, Sección 9, de nuestra Carta Magna se ha establecido una variedad de legislaciones, reglamentos y órdenes administrativas para promover la adecuada utilización de las propiedades y fondos públicos.  Estas disposiciones implementan, entre otras cosas, distintos mecanismos de cotejo, de modo que en los procesos fiscales exista una debida separación de funciones y responsabilidades que impida o dificulte la comisión de irregularidades.

68.    Asimismo, el TSPR ha subrayado el rol que deben tener los foros judiciales en la consecución de esta política pública, al expresar:

> Resulta pertinente recalcar que los tribunales debemos velar por el cumplimiento con las disposiciones legales dirigidas a proteger los desembolsos públicos, ya que esta normativa tiene como fin proteger el interés público en los dineros del pueblo y no a las partes contratantes.

Cordero v. Municipio de Guánica, 270 DPR 237, 249 (2007).

69.    La cláusula de selección de foro y de la interpretación del contrato no fue una negociada, sino que el funcionario del Estado se limitó a suscribir el contrato que fue enteramente redactado por TAC, sin tomar en consideración las repercusiones adversas de dicho proceder para la protección y desembolso de los fondos públicos. Esta cláusula claramente violenta la política pública que es una de rango constitucional en Puerto Rico.

70.    Ventilar una reclamación a raíz de este contrato en el Estado de Texas e interpretar el mismo bajo las leyes de ese Estado no ofrece las garantías de que se le dé cumplimiento a las disposiciones de ley de Puerto Rico que regulan todo lo referente a la otorgación del contrato y el desembolso de los fondos públicos como se le requiere que cumpla los tribunales.  Resulta realmente irrazonable e injusto que el Gobierno de Puerto Rico tenga que acudir a Texas a ventilar esta reclamación en un foro judicial donde aplicara por disposición del contrato las leyes de Texas para interpretar el mismo sin tomar en consideración las regulaciones de Puerto Rico.  Esto claramente conllevaría una patente inequidad y que no se le dé cumplimiento a la política pública de Puerto Rico y de sus estatutos.

71.    Darle validez a la cláusula claramente derrota la política pública imperante en Puerto Rico para la protección de los fondos públicos.  Es fundamental la protección de

los fondos públicos y que el gobierno como comprador cumpla con las disposiciones de ley requeridas para su desembolso.

72.     Más aún, el Artículo VI, Sección 9, de la Constitución de Puerto Rico establece claramente que el Estado tiene que promover la adecuada utilización de las propiedades y fondos públicos. En ese sentido, si se declarara que una cláusula de selección de foro o de ley extranjera es aplicable en contratos gubernamentales de adquisición de bienes no solamente iría en contra del interés público, sino de la norma constitucional que requiere el adecuado uso de fondos públicos. Ello, pues este tipo de cláusulas permitiría que se burle la amplia y rigurosa legislación de Puerto Rico que rige los contratos gubernamentales. Además, daría paso a que foros judiciales foráneos comiencen a interpretar las leyes, la política pública y hasta la Constitución en torno a la contratación gubernamental y la protección de los fondos públicos en Puerto Rico, lo que crearía un desface en el interés del Estado en mantener una política uniforme y rigurosa en cuanto a dichos temas.

73.     Así las cosas, resulta imperativo declarar inválidas las cláusulas de selección de foro y de ley aplicable para proteger los mejores intereses de los ciudadanos de Puerto Rico. De esa forma se evita que se usen este tipo de cláusulas para violentar y burlar el cumplimiento de las regulaciones del Estado. Los Tribunales de Puerto Rico son los llamados a interpretar las leyes del país y velar por el cumplimiento de éstas en lo relativo a la contratación del gobierno y en el desembolso de los fondos públicos.  Es en los tribuales de Puerto Rico donde se debe ventilar cualquier controversia relativa al contrato para la compra del vehículo de motos blindado e interpretar cualquier disposición legal sobre protección de los fondos públicos, las cuáles emanan del mandato constitucional.

## C.  Nulidad del contrato

74.     De entrada, el Artículo 1297 del Código Civil de 1930 (aplicable al presente caso) establecía que "[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público". Cód. Civ. PR 1930, Art. 1207.[2] Es por tal razón que, independientemente del tipo de contrato de que se trate y de la importancia que éste merezca para las partes contratantes, es nulo y, por lo tanto, inexistente un contrato que resulte contrario a las leyes, a la moral o al orden público. Morales v. Mun. de Toa Baja, 119 DPR 682 (1987).

---

[2] Se cita el Código Civil de Puerto Rico de 1930 dado a que es el aplicable al caso de epígrafe, pues el contrato en controversia fue suscrito en el 2018.

75.     Por otro lado, el Tribunal Supremo ha expresado reiteradamente que la buena administración de un gobierno es una virtud de democracia, y parte de su buena administración implica llevar a cabo sus funciones como comprador con eficacia, honestidad y corrección, para proteger los intereses y dineros del pueblo al cual dicho gobierno representa. Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 DPR 864, 871 (1990).

76.     Asimismo, el más Alto Foro ha subrayado que los estatutos que regulan y ordenan la realización de obras y adquisición de bienes y servicios para el Estado, sus agencias e instrumentalidades y los municipios, tienen como propósito la protección de los intereses y recursos fiscales del pueblo contra el dispendio, la prevaricación, el favoritismo y los riesgos del incumplimiento. Colón v. Municipio de Arecibo, 170 DPR 718, 7 (2007); Lugo Ortiz v. Municipio de Guayama, 162 DPR 208, 8 (2004); Cancel v. Mun. de San Juan, 101 DPR 296, 300 (1973).

77.     Lo anterior ha dado lugar a que el Alto Foro se haya expresado en múltiples instancias a favor de una normativa restrictiva en cuanto los contratos suscritos entre entes privados y gubernamentales. La aplicación rigurosa de los preceptos legales que rigen estas relaciones comerciales aspira promover una sana y recta administración pública, asunto que está revestido del más alto interés público. La facultad de obligar fondos públicos para el pago de una obligación está supeditada a que se sigan los procedimientos establecidos por ley.

78.     En ese sentido, la validez de los contratos gubernamentales tiene que determinarse considerando las disposiciones legales especiales que le aplican, más que la teoría general de las obligaciones y los contratos.  Incluso, en variadas ocasiones el Tribunal Supremo se ha negado a reconocerle validez a aquellos acuerdos pactados en contravención con las normas dispuestas. Colón v. Municipio de Arecibo, supra; Cordero v. Municipio de Guánica, 170 DPR en las págs. 16-17; Ríos v. Mun. de Isabela, 159 DPR 839, 846 (2003); Fernández & Gutierrez v. Mun. de San Juan, 147 DPR 824, 829 (1999).

79.     Como ya se indicó anteriormente, en cumplimiento con el mandato constitucional contenido en el Artículo VI, Sección 9, de nuestra Constitución se ha establecido una variedad de legislaciones, reglamentos y órdenes administrativas para promover la adecuada utilización de las propiedades y fondos públicos.  El Tribunal Supremo en el caso Rodríguez Ramos v. E.L.A. et al. 190 DPR 448, 456-58 (2014), nuevamente reiteró la normativa sobre contratación gubernamental:

> Respecto a la contratación gubernamental, el Estado está obligado por imperativo constitucional a manejar los fondos públicos con los principios fiduciarios y éticos más altos.

 Jaap Corp. v. Depto. Estado et al., 187 DPR 730, 739 (2013); C.F.S.E. v. Unión de Médicos, 170 DPR 443, 452 (2007).

80.     Para cumplir con este mandato constitucional, la Legislatura ha aprobado leyes que imponen controles fiscales y de contratación gubernamental. Jaap Corp. v. Depto. Estado et al., *supra*. En ese sentido, conforme a las disposiciones del Código Civil antes citadas, un contrato entre un ente privado y el Estado que no cumpla con estas leyes será nulo e inexistente. Cód. Civ. PR de 1930, Art. 1207. Así las cosas, que se discutan las disposiciones legales que aplican al contrato eje de la controversia en el caso de epígrafe.

### a.  Ley de Contabilidad del Gobierno de Puerto Rico

81.     La *Ley de Contabilidad del Gobierno de Puerto Rico*, Ley Núm. 230 de 23 de julio de 1974 ("Ley Núm. 230-1974) se aprobó con el propósito de lograr el "control previo de todas las operaciones del gobierno" para que sea posible planificar el presupuesto y programas de gobierno correspondientes. Ley Núm. 230–1974, Art. 2(e).

82.     A esos efectos, esta ley establece que "[t]odas las asignaciones y los fondos autorizados para las atenciones de un año económico, serán aplicados exclusivamente al pago de los gastos legítimamente incurridos durante el respectivo año o al pago de obligaciones legalmente contraídas y debidamente asentadas en los libros". (Énfasis suplido). Ley Núm. 230–1974, Art. 8(a).

83.     Cabe destacar que el Artículo 3(k) de la referida ley define "obligación" como "[u]n compromiso contraído que esté representado por orden de compra, contrato o documento similar, pendiente de pago, firmado por autoridad competente para gravar las asignaciones, y que puede convertirse en el futuro en deuda exigible."

84.     De igual manera, el Art. 9(a) del mismo cuerpo legal, 3 L.P.R.A. sec. 283h(a), exige que **[l]as dependencias ordenarán obligaciones y desembolsos de sus fondos públicos únicamente para obligar o pagar servicios, suministros de materiales y equipos, reclamaciones u otros conceptos que estuvieren autorizados por ley.** El Secretario contabilizará las obligaciones y efectuará y contabilizará los desembolsos a través de documentos que sometan las **dependencias, los cuales serán previamente aprobados para obligación o pago por el jefe de la dependencia correspondiente** o por el funcionario o empleado que éste designare como su representante autorizado. Énfasis suplido.

85.     Así pues, la Ley Núm. 230–1974 establece claramente que, **para que un contrato otorgado por el Estado y una parte privada sea válido y exigible, este debe constar por escrito previo a las prestaciones correspondientes.** Énfasis nuestro.

86.     Del examen de los documentos de este caso se desprende que este contrato es nulo pues no hubo cumplimiento con las disposiciones legales establecidas en la Ley de contabilidad del Gobierno, como una dispensa para el pago de fianza por parte de TAC entre otros defectos estatutarios y reglamentarios.

### b.  El contrato no contiene las cláusulas requeridas por ley

87.     Con el fin de proteger los intereses y dineros del pueblo contra el dispendio, la prevaricación, el favoritismo y los riesgos de incumplimiento, existen varias disposiciones estatutarias que regulan la realización de obras y contratación de servicios para las agencias e instrumentalidades. Mun. de Quebradillas v. Corp. Salud Lares, 180 DPR 1003, 1011–12 (2011); Cancel, 101 DPR en la pág. 300.

88.     En Quest Diagnostics v. Mun. San Juan, 175 DPR 994, 1000 (2009), el TSPR expresó que, mediante estatutos especiales, el legislador ha impuesto requisitos y condiciones a la contratación gubernamental. *Johnson & Johnson v. Mun. de San Juan*, 172 DPR 840, 854–855 (2007); *Cordero Vélez v. Mun. de Guánica*, 170 DPR 237, 252 (2007). A los contratos con entidades gubernamentales se les examina su validez de acuerdo con los estatutos especiales, en lugar de acudir a las teorías generales de contratos. Id. Por lo tanto, resulta crucial que los municipios actúen de manera acorde con los procedimientos establecidos por ley y nuestra jurisprudencia interpretativa al momento de desembolsar fondos públicos para el pago de las obligaciones contraídas. Id.

89.     En Puerto Rico hay diversos estatutos, reglamentos o cartas circulares que requieren que los contratos de compra de bienes otorgados por una entidad gubernamental contengan una serie de cláusulas cuya ausencia tendría el efecto de hacer el mismo nulo *ab intio*.

90.     El Artículo 3.3 del *Código Anticorrupción para el Nuevo Puerto Rico*, Ley Núm. 2-2018, establece que el estatuto "será de aplicabilidad a toda persona que en su vínculo con las agencias ejecutivas del Gobierno de Puerto Rico participe de licitaciones en subastas, le presente cotizaciones, interese perfeccionar contratos con ellas o procure recibir la concesión de cualquier incentivo económico". Asimismo, dicha ley dispone que "[s]erá requisito indispensable para contratar con el Gobierno que toda persona se comprometa a regirse por las disposiciones de este Código de Ética [...] **[t]al hecho se hará constar en**

**todo contrato entre las agencias ejecutivas y contratistas o suplidores de servicios,**

**y en toda solicitud de incentivo económico provisto por el gobierno**". Ley Núm. 2-

2018, Art. 3.3 (énfasis suplido).

91.     Similarmente, el aludido Artículo 3.3 de la Ley Núm. 2-2018 requiere que:

[L]a persona natural o jurídica que desee participar de la adjudicación de una subasta o en el otorgamiento de algún contrato, con cualquier agencia o instrumentalidad gubernamental, corporación pública, municipio, o con la Rama Legislativa o Rama Judicial, para la realización de servicios **o la venta o entrega de bienes**, **someterá una declaración jurada, ante notario público**, en la que informará si la persona natural o jurídica o cualquier presidente, vicepresidente, director, director ejecutivo, o miembro de una junta de oficiales o junta de directores, o personas que desempeñen funciones equivalentes para la persona jurídica, ha sido convicta o se ha declarado culpable de cualquiera de los delitos enumerados en la Sección 6.8 de la Ley 8-2017, según enmendada, conocida como "Ley Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", o por cualquiera de los delitos contenidos en este Código.

Ley Núm. 2-2018, Art. 3.3 (énfasis suplido).

92.     Igualmente, el Artículo 3.4 de la mencionada Ley Núm. 2-2018 establece que

"[t]odo contrato deberá incluir una cláusula de resolución en caso de que la persona que

contrate con las agencias ejecutivas resultare convicta, en la jurisdicción estatal o federal,

por alguno de los delitos que le inhabilitan para contratar bajo el inciso anterior". Más aún,

el aludido artículo dispone que "[e]n los contratos se certificará que la persona no ha sido

convicta, en la jurisdicción estatal o federal, por ninguno de los delitos antes dispuestos".

Id.

93.     Por otro lado, el Artículo 1(e) de la *Ley de Registro de Contratos*, Ley Núm. 18

de 30 de octubre de 1975 ("Ley Núm. 18-1975"), dispone lo siguiente:

En todo contrato sujeto a registro conforme el Artículo 1 de esta Ley se consignará en forma clara y conspicua un aviso que leerá como sigue: **"Ninguna prestación o contraprestación objeto de este contrato podrá exigirse hasta tanto el mismo se haya presentado para registro en la Oficina del Contralor a tenor con lo dispuesto en la Ley Núm. 18 de 30 de octubre de 1975, según enmendada".**

Ley Núm. 18-1975, Art. 1(e) (énfasis en el original).

94.     El Tribunal Supremo ha sido sumamente claro al expresar que las partes

privadas que contratan con los municipios y las agencias del gobierno tienen que contratar

de acuerdo con lo que la ley exige. Vicar Builders v. ELA, 192 DPR 256 (2015). Para evitar

situaciones irregulares en las que el Estado termine lucrándose injustificadamente, las partes deberán ser meticulosas al otorgar sus contratos. Id.

95.     En el presente caso, el contrato de compra del vehículo de motor blindado no contiene las mencionadas cláusulas requeridas por la Ley Núm. 2-2018. De igual forma, del expediente de ASG no surge que TAC hubiese remitido la declaración jurada ante notario público en la que informara si la persona natural o jurídica o cualquier presidente, vicepresidente, director, director ejecutivo, o miembro de una junta de oficiales o junta de directores, o personas que desempeñen funciones equivalentes para la persona jurídica, ha sido convicta o se ha declarado culpable de cualquiera de los delitos enumerados en la Sección 6.8 de la Ley 8-2017 u otros delitos contenidos en la Ley Núm. 2-2018.  Por ende, TAC y su CEO, el señor Kimball, incumplieron con la aludida disposición de la Ley Núm. 2-2018.

96.     Por otra parte, el contrato en cuestión tampoco incluyó la cláusula requerida por la Ley Núm. 18-1975, estableciendo que "Ninguna prestación o contraprestación objeto de este contrato podrá exigirse hasta tanto el mismo se haya presentado para registro en la Oficina del Contralor a tenor con lo dispuesto en la Ley Núm. 18 de 30 de octubre de 1975, según enmendada".

97.     Así las cosas, las deficiencias de las que adolece el contrato en cuestión tienen el efecto de que el mismo incumpla tanto con la Ley Núm. 18-1975 como con la Ley Núm. 2-2018. Por tanto, al tratarse de un contrato que va en contra de la ley, el mismo resulta nulo *ab initio* y no vincula al Estado. Véase Cód. Civ. PR 1930, Art. 1207.

### c.  Reglamento 31 del Departamento de Hacienda

98.     Es nuestra postura que el contrato tenía que cumplir con lo establecido en el Reglamento 31 del Departamento de Hacienda, conocido como Pago Por Anticipado De Bienes o Servicios Al Gobierno De Puerto Rico, aprobado el 21 de junio de 2007. Este reglamento aplica a todo organismo gubernamental cuyos fondos estén bajo la custodia y control del Secretario de Hacienda. En la parte de Instrucciones Específicas del reglamento, en sus incisos 3 y 4, establece lo siguiente:

> 3.     Cuando el importe del pago exceda $10,000 la agencia solicitará al suplidor que preste una fianza igual al total del pago anticipado. En los casos de contrato, la agencia no podrá formalizar el mismo hasta que reciba el documento de fianza. Esto no aplica en los casos indicados en el Apartado 1, ni en aquellos casos en que a solicitud de las agencias y por recomendación

del Director del Negociado de Intervenciones, el Secretario Auxiliar del Área de Contabilidad Central así lo autorice.

4. La fianza debe ser con una compañía fiadora autorizada por la Oficina del Comisionado de Seguros para hacer negocios en Puerto Rico. Enviarán al Negociado de Intervenciones de este Departamento el documento de fianza, junto con los documentos que originen el pago por anticipado.

99. Al presente no hay ninguna constancia de que TAC haya prestado la fianza de conformidad a las disposiciones del Reglamento 31 anteriormente citadas. De igual forma, de la documentación examinada no hay evidencia que el Secretario Auxiliar del Área de Contabilidad Central haya autorizado no prestar la fianza requerida a TAC al realizar un pago anticipado que excediera los $10,000, _véase_ Anejo II.

100. En el presente caso se emitieron dos pagos anticipados, un pago de $165,950 el 1 de marzo de 2018 y otro pago de $58,150 el 26 de octubre de 2018. Esto se hizo para cumplir con las exigencias del contrato redactado por TAC.

### d. Otras consideraciones de la nulidad del contrato

101. Otro elemento a considerar para establecer la nulidad es si el contrato redactado por TAC, que a todas luces es un contrato de adhesión, cumple con las exigencias de ley de Puerto Rico para otorgar un contrato con el gobierno. El Tribunal Supremo, en Coop. Sabanera v Casinao Rivera, 184 DPR 169 (2011), expresó lo siguiente:

> La norma de este Tribunal ha sido consistentemente que, si bien los contratos de adhesión son válidos en nuestra jurisdicción, la interpretación de sus disposiciones se hará favorablemente hacia la parte que nada tuvo que ver con su redacción.

Herrera v. First National City Bank, 103 DPR 724, 727 (1975); Ulpiano Casal,Inc. v Totty mfg. Corp., 90 DPR 739, 744 (1964); Maryland Cas & Co, supra.

102. Sin embargo, "[e]l hecho de que un contrato sea de adhesión ... significa tan solo que se analizará del modo más favorable a la parte más débil, ... pero no que se interpretará de modo irrazonable". (Énfasis suplido.) R.C. Leasing Corp., supra, pág. 167. Por tal motivo, es un error conceptual que los contratos de adhesión se consideren nulos meramente por ser redactados por una sola de las partes. Véase C.R.U.V. v. Peña Ubiles, 95 DPR 311, 314 (1967).

103. Ante tales contratos, la función principal de un tribunal debe dirigirse a evaluar la presencia de cláusulas ambiguas. En ausencia de ambigüedad, el contrato se interpretará según sus términos. S.L.G. Ortiz-Alvarado v. Great American, 182 DPR 48 (2011); Martínez Pérez v. U.C.B., 143 DPR 554 (1997).

104.    Independientemente del tipo de cláusula en cuestión—bien sea una cláusula penal u otra dispositiva—el método de interpretación descrito se aplicará por igual. Despejada la apariencia de ambigüedad, el tribunal entonces procederá a evaluar la razonabilidad de lo allí convenido.

105.    La posición del Estado es que el contrato de esta controversia claramente violentó la política pública para la protección de los fondos públicos por los que resulta ser uno ilegal, toda vez que solo quedan protegidos los intereses de TAC y no hay protección efectiva de los intereses del Estado.  Una mera lectura de las cláusulas del contrato refleja que el mismo es claramente arbitrario y parcializado a favor de TAC.

106.    El referido contrato no provee una opción para recuperar los fondos públicos, pues claramente establece que todo dinero recibido no es reembolsable. El contrato también establece la posibilidad que bajo ciertas circunstancias la empresa podría quedarse con el vehículo de motor sin reembolsar al Estado dinero alguno. No hay una cláusula que le permita al Gobierno de Puerto Rico resolver el contrato con previa notificación y que se le reembolse el dinero pagado.  Resulta evidente que las cláusulas del contrato laceran el orden público por no brindar garantía alguna de recuperar los fondos hasta la fecha pagados por el Pueblo Puertorriqueño.

## e.  El desembolso de dinero a TAC fue un cobro de lo indebido

107.    El Art. 1795 del Código Civil, 31 L.P.R.A. sec. 5121, código vigente al momento de los hechos, recoge la doctrina del cobro de lo indebido y establece: "Cuando se recibe alguna cosa que no había derecho a cobrar, y que por error ha sido indebidamente entregada, surge la obligación de restituirla".

108.    El TSPR ha reconocido que para que se configure la doctrina del cobro de lo indebido es necesaria la concurrencia de tres requisitos: (1) que se produzca un pago con la intención de extinguir una obligación; (2) que el pago realizado no tenga una justa causa, es decir, que no exista obligación jurídica entre el que paga y el que cobra, o sí la obligación existe, que sea por una cuantía menor a la pagada, y (3) que el pago haya sido hecho por error no por mera liberalidad o por cualquier otro concepto. Sepúlveda v. Depto. De Salud,145 DPR 560 (1998).

109.    En Arandes v Báez 20 DPR 388 (1914), el TSPR estableció la distinción entre el error de hecho y el error de derecho. La norma anterior establecía que en la doctrina del cobro de lo indebido solo el error de hecho, y no el de derecho, daba lugar a la obligación

de restituir. <u>Sepúlveda</u>, 145DPR en la pág. 567; <u>Aulet v Depto. Servicios Sociales</u>, 129 DPR 1 (1991).

110.    En <u>Sepúlveda</u>, el TSPR definió por primera vez que el error de derecho era "...aquel en el que incurre quien actúa sin ajustarse a lo dispuesto por una norma jurídica vigente". En el contexto del cobro de la indebido, comete error de derecho quien realiza un pago bajo la creencia de que el mismo le es exigible en derecho, bien por desconocimiento de la norma que lo descarga del pago, bien por una interpretación errónea del derecho aplicable.

111.    Ahora bien, en <u>ELA v. Crespo Torres</u>, 180 DPR 776 (2011), el TSPR estableció que el error de derecho también daba paso a la restitución del dinero que se pagó indebidamente. Particularmente, el TSPR estableció que, si el error en el pago se alega como excusa del cumplimiento de una ley, éste no puede tomarse en cuanta y la ley debe cumplirse. Por eso, en <u>Crespo Torres</u> el TSPR acogió la corriente moderna sobre el cobro de la indebido y se excluyó la distinción entre el error de hecho y derecho para efectos de la restitución.

112.    En el presente caso se configuran los requisitos de cobro de lo indebido respecto a los pagos realizados a TAC. Primero, los pagos emitidos a la empresa se realizaron con la intención de extinguir una obligación- el pago del vehículo blindado. Segundo, el pago realizado no tenía una justa causa, es decir, no existía la obligación jurídica entre el que paga y el que cobra toda vez que el contrato adolece de nulidad. Tercero, el pago se realizó por error de derecho toda vez que el Departamento de Hacienda no autorizó, según lo requiere el Reglamento 31 de Hacienda, para el pago por adelantado del vehículo.

113.    El señor Ronald Trent Kimball, el CEO de TAC, se ha lucrado del cobro de lo indebido.

114.    Además, de una búsqueda en el registro de contratos de la página del Contralor, no surge que el contrato con Texas Armory Corporation haya sido registrado conforme requiere la ley. <u>Véase</u>, Ley Núm. 18 del 30 de octubre de 1975, conocida como la Ley de Registros de Contratos; <u>véase además</u>, <u>Colón Colón v. Municipio de Arecibo</u>, 170 D.P.R. 718, 727-728 (2007). Por tanto, lo anterior es un fundamento adicional para invalidar el pago realizado a TAC.

**D.  Incumplimiento de contrato**

115.    En la alternativa, del Tribunal entender que no aplica la nulidad de contrato, TAC ha incurrido en un claro incumplimiento de contrato que conlleva resolver el mismo.

116.    En <u>Álvarez Choudens v Rivera</u>, 165 DPR 1, 2005 el Tribunal Supremo reiteró que en Puerto Rico rige el principio de la libertad de contratación, según el cual las partes contratantes pueden establecer los pactos, las cláusulas y las condiciones que tengan por conveniente, siempre que no sean contrarias a las leyes, a la moral ni al orden público. Art. 1207 del Código Civil, supra, <u>SLG Irizarry v. SLG García</u>, 155 DPR 713 (2001); <u>Trinidad v. Chade</u>, 153 DPR 280 (2001); <u>Arthur Young & Co. v. Vega III</u>, 136 DPR 157 (1994); <u>Plaza del Rey, Inc. v. Registrador</u>, 133 DPR 188 (1993); <u>Casiano, Jr. v. Borintex Mfg. Corp.</u>, 133 DPR 127 (1993). Además, en dicho caso se expresa que a partir del perfeccionamiento de un contrato, las partes quedan obligadas al cumplimiento de lo expresamente pactado y a las consecuencias que se deriven de éste, ello conforme a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, 31 LPRA §3375; <u>Trinidad v. Chade</u>, <u>supra</u>.

117.    Cuando un contrato es legal, válido y carente de vicios del consentimiento, constituye la ley entre las partes y debe cumplirse a tenor de éste. Art. 1044 del Código Civil, 31 LPRA §2994; <u>Constructora Bauzá, Inc. v. García López</u>, 129 DPR 579, 593 (1991); <u>Cervecería Corona v. Commonwealth Ins. Co.</u>, 115 DPR 345 (1984). Es por ello que el Art. 1054 del Código Civil, 31 LPRA §3018, sujeta a aquellos que de alguna manera contravengan sus obligaciones a la indemnización por los daños y perjuicios causados. Bajo dicho supuesto, todo incumplimiento contractual dará lugar a un resarcimiento.

118.    Más aún, las acciones ex contractu se basan en el quebrantamiento de un deber que surge de un contrato expreso o implícito, y tienen por objeto que se cumplan las promesas sobre las cuales las partes otorgaron su consentimiento. <u>Ramos v. Orientalist Rattan Furnt.</u>, Inc., 130 DPR 712 (1992); <u>Ocasio Juarbe v. Eastern Airlines, Inc.</u>, 125 DPR 410, (1990); <u>Santiago Nieves v. ACAA</u>, 119 DPR 711, (1987); <u>Mejías v. López</u>, 51 DPR 21, 26 (1937).

119.    Por ende, para que proceda esta acción tiene que haber habido un acuerdo de voluntades que genere una obligación, situación o estado de derecho resultante de un convenio y que haya creado unas expectativas a base de las cuales actuaron las partes. <u>Trinidad v. Chade</u>, <u>supra</u>.

120.    En el caso de las obligaciones recíprocas, como es el contrato aquí en controversia, el Art. 1077 del Código Civil, 31 LPRA §3052, provee:

Derecho de resolver obligaciones recíprocas

La facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere con lo que le incumbe.

El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aun después de haber optado por el cumplimiento, cuando éste resultare imposible.

121. De la referida disposición estatutaria surge que, ante un incumplimiento de una obligación bilateral, el perjudicado puede optar entre exigir el cumplimiento de la obligación o su resolución, y en ambos casos, si tal incumplimiento ha tenido repercusiones en su patrimonio de forma desfavorable, puede reclamar el resarcimiento por los daños ocasionados.

122. En cuanto a la resolución del contrato, hemos indicado que la referida disposición estatutaria establece una condición resolutoria tácita en todo contrato bilateral que opera ex propio vigore. Constructora Bauzá, Inc. v. García López, *supra*. En consecuencia, si uno de los contratantes incumple, el otro puede darlo por resuelto sin necesidad de que un tribunal así lo declare. Flores v. Municipio de Caguas, 114 DPR 521 (1983); Sucn. Escalera v. Barreto, 81 DPR 596 (1935).

123. Cuando nos enfrentamos a un cumplimiento parcial o defectuoso, en principio, se justifica el ejercicio de la acción de resolución. No obstante, en la doctrina civilista se entiende que el ejercicio del derecho de resolución no debe ser utilizado en todas las situaciones, ya que la buena fe en la contratación puede imponer alguna moderación a este resultado. L. Díez-Picazo y A. Gullón, Sistema de Derecho Civil, 4ta ed. rev., Madrid, Ed. Tecnos, 1983, Vol. II, págs. 226–227; J. Puig Brutau, Fundamentos de Derecho Civil, 2da ed. rev., Barcelona, Ed. Bosch, 1985, T. I, Vol. 2, págs. 126–127.

124. Dicho de otra manera, únicamente si el cumplimiento parcial o defectuoso implica la frustración de la finalidad contractual para la parte perjudicada procederá, entonces, la resolución del contrato. Díez-Picazo y Gullón, op. cit., pág. 227; Puig Brutau, op. cit., pág. 127. En los demás casos, en que la prestación se ha efectuado parcialmente o resulta defectuosa, será procedente exigir el cumplimiento total o libre de defectos y, en los casos en que proceda, una reducción proporcional del precio. Id.

125. Por otro lado, el Art. 1077 del Código Civil, supra, reconoce de igual forma que ante el incumplimiento de una obligación recíproca, la parte perjudicada puede exigir su cumplimiento. De esta manera, el Código Civil consagra el principio general que postula que en las obligaciones bilaterales ninguna de las partes puede demandar el cumplimiento de la obligación contraria sin cumplir u ofrecer el cumplimiento de la obligación propia. En otras palabras, si el que incurre en incumplimiento exige la satisfacción de la prestación debida, la otra parte puede oponer la defensa del contrato incumplido. Mora Dev. Corp. v. Sandín, 118 DPR 733, 742 (1987).

126. En el caso de epígrafe, la relación de hechos demuestra que TAC y su CEO, el señor Kimball, han incurrido en un claro incumplimiento de contrato. El ELA ha cumplido cabalmente con lo requerido por el contrato, no obstante TAC a pesar del tiempo transcurrido y las gestiones realizadas no ha entregado el vehículo de motor habiendo

transcurrido 3 años desde que se realizó el contrato para su adquisición. En estos momentos ya resulta impráctico y oneroso el cumplimiento de TAC con su prestación, ya que con el tiempo transcurrido el vehículo de motor no es del año corriente, sino de tres años atrás. La única garantía que ofrece TAC es en cuanto el blindaje, pero no en lo relativo a las garantías por el transcurso del tiempo y/o su millaje de uso. El que entregue el vehículo de motor hoy en día conllevaría un gasto adicional para el Estado para adquirir una garantía extendida con respecto a la operación y funcionalidad del vehículo. Lo único que procede en esta situación de hechos es resolver el contrato por incumplimiento y que TAC le devuelva al ELA la totalidad de los fondos desembolsados.

## V. SÚPLICA

**POR TODO LO CUAL**, se solicita a este Ilustrado Tribunal que declare lo siguiente:

1.  Que declare **HA LUGAR** la Sentencia Declaratoria y decrete así la nulidad de la cláusula de selección de foro y selección de ley del estado de Texas para la interpretación de este contrato por ser el mismo en contra de la ley, la moral y orden público.

2.  Que declare **HA LUGAR** la causa de acción por nulidad del contrato en contra de TAC por no cumplir con requisitos legales de la contratación con el gobierno y como consecuencia ordene la restitución de todo el dinero pagado más intereses, costas y gastos legales.

3.  Que declare **HA LUGAR** la causa de acción por cobro de lo indebido y ordene a TAC y sus principales accionistas a devolverle la cantidad de $224,100 más intereses, costas y gastos legales al Estado Libre Asociado de Puerto Rico.

4.  En la alternativa, del Tribunal concluir que no opera la nulidad del contrato, que se declare **HA LUGAR** la causa de acción por incumplimiento de contrato y ordene a TAC a devolver la cantidad de $224,100 más intereses, costas y gastos legales al Estado Libre Asociado de Puerto Rico.

5.  Que se imponga a los demandados el pago de las costas y los honorarios al Estado por la presentación del presente caso.

6.  Que se emita cualquier otro remedio que proceda en derecho.

**CERTIFICO** que este escrito ha sido presentado de manera electrónica a través del Sistema Unificado de Manejo y Administración de Casos (SUMAC), el cual da aviso simultáneamente a todos los abogados de récord a sus respectivas direcciones electrónicas,

lo cual constituye la notificación que debe efectuarse entre abogados y abogadas, según disponen las Reglas de Procedimiento Civil.

En San Juan, Puerto Rico, el 26 de febrero de 2021.

**DOMINGO EMANUELLI HERNÁNDEZ**
Secretario de Justicia

**SUSANA I. PEÑAGARÍCANO BROWN**
Secretaria Auxiliar de lo Civil

f/ Juan C. Ramírez Ortiz
**JUAN C. RAMÍREZ ORTIZ**
Subsecretario Auxiliar de lo Civil
RUA 19,713
juramirez@justicia.pr.gov

DEPARTAMENTO DE JUSTICIA
P.O. Box 9020192
San Juan, PR 00902-0192

f/Godohaldo Pérez Torres
**GODOHALDO PÉREZ TORRES**
Director de Asuntos Legales
División de Contributivo, Cobro de Dinero
y Expropiaciones

f/Víctor E. Jiménez Romero
**VÍCTOR E. JIMÉNEZ ROMERO**
RUA 21,602
vicjimenez@justicia.pr.gov